**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| MAPLEBEAR INC. DBA INSTACART, a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No: 1:21-cv-474 (AJT/IDD) |
| JOHN DOES 1-2, CONTROLLING AND OPERATING A MALICIOUS APPLICATION KNOWN AS SHOPPER HELPER, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**DEFAULT JUDGMENT AND PERMANENT INJUNCTION**

**I.      INTRODUCTION**

Plaintiff Maplebear Inc. dba Instacart ("Instacart" or "Plaintiff") seeks a default judgment and permanent injunction to prevent Defendants John Does 1-2 from continuing to operate the fraudulent application known as "Shopper Helper." As set forth in Plaintiff's pleadings and the Court's previous orders, Defendants have engaged in distribution of Shopper Helper, which is intended to profit off of Plaintiff's proprietary software and trademarks and illegally access Plaintiff's computer networks to obtain order batch information. Defendants have leveraged verbatim copying of Plaintiff's legitimate Shopper Application ("Shopper App") and misused Plaintiff's intellectual property to create a copy-cat mobile application. Defendants have maintained and distributed the fraudulent Shopper Helper application through various Internet domains, IP addresses and e-commerce infrastructure.

Plaintiff requests a permanent injunction (1) prohibiting Defendants from operating or

distributing the fraudulent Shopper Helper application, engaging in associated conduct or operating associated infrastructure and (2) providing continuing jurisdiction of the Court to enforce the permanent injunction, should Defendants violate the terms of the injunction.  This injunctive relief is required to prevent further harm to Plaintiff, its Shoppers and customers, and the general public that would be caused if Defendants are able to continue their activities.  A permanent injunction is the only way to afford relief and abate future harm in this case.  It has already been seen that in the past, Defendants put in place new infrastructure, thus there is a risk that they will do so in the future, demonstrating the need for permanent and ongoing relief.  Plaintiff duly served Defendants with the Complaint and all pleadings and orders of the Court in this action in a manner consistent with Due Process and this Court's instructions, by email and publication at the website http://www.noticeofpleadings.com/shopperhelper.  Defendants failed to respond and the Clerk of the Court entered default on October 21, 2021. Dkt. 36.  The factual allegations in the Complaint and the record in the case establish the elements of each of Plaintiff's claims and also establish the need for the requested injunctive relief.

## II.    FACTUAL BACKGROUND

This action arises out of violations of federal and state law caused by Defendants' operation of a fraudulent, counterfeit application, known as "Shopper Helper," carried out through a variety of Internet domains, IP addresses and e-commerce facilities.  Instacart seeks to stop Defendants' illegal conduct, including misuse of Instacart's Platform, access to Instacart's batch information from Instacart's infrastructure without authorization, unauthorized use of authentication tokens generated by Instacart to perpetuate the fraudulent conduct, and the misuse of Instacart's recognizable trademarks.

Plaintiff operates the Instacart platform and associated Instacart Shopper App, used by

Shoppers to, among other things, review and accept batches of customer orders for shopping and/or delivery.  Plaintiff does not sell ownership rights, copyright, or other intellectual property rights to its Shopper App.  Instead, Instacart's Shoppers must obtain a license, which grants Shoppers limited rights to install the Shopper App and to access and use the Shopper App, including accessing and viewing batches of orders, subject to Instacart's technical security measures. Declaration of Henry S. Levin ("Levin Decl.") ¶ 5 at Dkt. 12; *see also* Declaration of Dylan Tonti ("Tonti Decl.") at ¶¶ 2-3, Ex. A, at Dkt. 10.  Prospective Shoppers who create a Shopper account to use the Shopper App must accept the Shopper App's Terms of Services ("Shopper App Terms"). *Id*. at ¶ 10; Levin Decl. ¶ 12.

Plaintiff's operative Shopper App Terms explicitly state that Plaintiff owns all trademarks, copyrights, database rights, patents, and other intellectual property rights of any nature in the Shopper App, together with the underlying software code. *See* Tonti Decl. ¶ 4, Ex. 1, § 2.1.  The Shopper App Terms explicitly prohibit anyone from "reproduc[ing] [the Shopper App] in any form or by any means," and each Shopper agrees "not to modify, rent, lease, loan, sell, distribute, or creative derivative works based on the Shopper App in any manner, and you shall not exploit the Shopper App in any unauthorized way whatsoever, including, but not limited to, by trespass or burdening network capacity." *Id*. at ¶ 5, Ex. 1, § 2.1.  Further, while the Shopper App Terms grant the right to a range of permissible uses, each party creating a Shopper account specifically agrees that he or she can only use the Shopper App subject to several conditions, including that the Shopper will "not make any automated uses of the Shopper App or the Instacart Platform or gain any other unauthorized access therewith." *Id*. ¶ 6, Ex. 1, §§ 3.2(d)-(h).

Shopper Helper is an unauthorized third-party mobile application that runs on top of

Instacart's legitimate Shopper App.  *See generally* Declaration of Adam Gayde ("Gayde Decl."), at Dkt. 11.  It is designed to execute the Shopper App's core functionalities, but includes automatically filtering and selecting the 'best batch' for a user and bypassing the designed Instacart native batch selection and offering process. *Id.* ¶ 8.  Shopper Helper includes, for example, technology that unfairly leverages filters, such as the geographic proximity of the grocery store, the delivery distance, and the earning potential, and automatically accepts orders in a manner that may prevent Shoppers using the legitimate Shopper App from accepting such orders. *Id.*  Defendants have operated the Shopper Helper application through the domains, IP address and e-commerce facilities set forth at **Appendix A** to the Complaint and the proposed Permanent Injunction.

During its operation, the fraudulent Shopper Helper app intercepts credentials, particularly authentication tokens and cookies, of the legitimate Shopper App, and leverages those to fraudulently circumvent Plaintiff's technical measures that control access to Plaintiff's AWS servers, intellectual property, and proprietary information including batch data. Gayde Decl. ¶¶ 19, 23-29.  The fraudulent Shopper Helper application also replicates Plaintiff's Shopper App functionalities and user interface, including the Instacart word mark and carrot logo, all constituting Plaintiff's trademarks.  *Id.*; Levin Decl. ¶ 25.  Thus, because the Shopper Helper app uses Plaintiff's trademarks, content and protected user interfaces, it is a fraudulent, counterfeit and adulterated version of Plaintiff's Shopper App.  Levin Decl. ¶¶ 24-25.  During its operation, using the intercepted authentication tokens and cookies, the fraudulent Shopper Helper app also makes unauthorized access to Plaintiff's AWS servers, which are located in the Eastern District of Virginia.  Levin Decl. ¶¶ 21, 28.

Shopper Helper harms Plaintiff by accessing Plaintiff's servers to obtain batch

information without authorization and disrupting the distribution of batches among Shoppers using Plaintiff's legitimate Shopper App.  Levin Decl. ¶¶ 21-27.  In doing so, Shopper Helper seeks to benefit from the fruits of Plaintiff's labor in developing and maintaining a complex algorithm for batch offering to Shoppers based on numerous factors including efficiency and fairness to Shoppers.  Shopper Helper seeks to give its users an unfair advantage over Shoppers using Plaintiff's legitimate Shopper App.  This causes disruption of the normal batch distribution process and causes associated dissatisfaction with Plaintiff's Shopper App and services and diminishes Shopper confidence in Plaintiff's platform. *Id*.  Defendants' activities harm Instacart's reputation and goodwill among the public, and particularly among Shoppers who may incorrectly believe that Shopper Helper is sanctioned, sponsored, or associated in some manner with Instacart. *Id*.

Shopper Helper harms Plaintiff and Plaintiff's Shoppers and customer ecosystem by damaging Plaintiff's proprietary Shopper App installed on Shoppers' mobile devices. Levin Decl. ¶ 31.  Shopper Helper is specifically designed to run on mobile devices that at one point were equipped with Plaintiff's Shopper App.  *Id*.  In fact, Shopper Helper cannot operate unless the user has at some point downloaded the Instacart Shopper app and created an account.  *Id*. The Plaintiff's legitimate Shopper App is licensed by Plaintiff to its users. *Id*.  Once the Shopper creates an account with Plaintiff's Shopper App, Shopper Helper will leverage the Shopper's credentials in order to operate the counterfeit, adulterated version of Plaintiff's Shopper App. *Id*. Plaintiff devotes significant computing and human resources to combating bots like Shopper Helper. *Id*. ¶ 32. Shopper Helper irreparably harms Plaintiff by damaging its reputation, brands, and Shopper goodwill. *Id*. ¶ 33.  In effect, once altered and controlled by Shopper Helper, the Plaintiff's Shopper App ceases to operate normally and becomes a tool for Defendants to

conduct their unauthorized access to batch information on Plaintiff's servers and automated processes. *Id*. ¶ 34. Yet, they still bear Plaintiff's trademarks. *Id*. This misleads Plaintiff's Shoppers and the public generally into wrongly believing that Plaintiff condones, facilitates or somehow is associated with the use of Shopper Helper. *Id*.

Plaintiff has invested substantial resources in developing high-quality products and services. *Id*. ¶ 34. Due to the high quality and effectiveness of these products and services and the expenditures of significant resources by Plaintiff to market those products and services, Plaintiff has generated substantial goodwill with its Shoppers, has established strong brands, and has developed the Instacart name and the names of its products and services into strong and famous world-wide symbols that are well-recognized within its channels of trade. *Id*.  Plaintiff has registered trademarks representing the quality of its products and services and its brand, including Instacart® and the carrot logo, all of which are confusingly and fraudulently used by Defendants. *Id*. ¶¶ 31-35.

On April 20, 2021, the Court entered a TRO that disabled the Defendants' existing infrastructure used to control and distribute Shopper Helper, as discussed above.  Dkt. 17.  The Court subsequently entered a Preliminary Injunction against the Defendants, prohibiting them from continuing to engage in the operation and distribution of Shopper Helper and associated activities and infrastructure.  Dkt. 29.  Defendants in the past registered a number of different domains and other infrastructure, over time, to control and distribute Shopper Helper and to engage in associated activities.  Gayde Decl. ¶¶ 6-30.  Given their past activities, there is a substantial risk that if not permanently enjoined and if the Court does not maintain jurisdiction and the ability to enforce the injunction, Defendants will continue to carry out efforts to establish new infrastructure, to continue the harmful activities described above.

### III.   <u>LEGAL STANDARD</u>

Rule 55 of the Federal Rules of Civil Procedure authorizes the entry of a default judgment when a defendant fails to plead or otherwise defend in accordance with the Federal Rules. *Tweedy v. RCAM Title Loans, LLC*, 611 F. Supp. 2d 603, 605 (W.D. Va. 2009) (citing *United States v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982)).  The Clerk's interlocutory "entry of default" pursuant to Federal Rule of Civil Procedure 55(a) provides notice to the defaulting party prior to the entry of default judgment by the court.  In turn, Federal Rule of Civil Procedure 55(b)(2) "authorizes courts to enter a default judgment against a properly served defendant who fails to file a timely responsive pleading." *LPS Default Solutions, Inc. v. Friedman & MacFadyen, P.A.*, 2013 U.S. Dist. LEXIS 108486, at *2-3 (D. Md. Aug. 2, 2013).  Default judgment is appropriate when the adversary process has been halted because of an unresponsive party. *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005).  Upon default, the well-pled allegations in a complaint as to liability are taken as true. *Id.*  Here, the Clerk has entered Defendants' default under Rule 55(a) (Dkt. 36), and Defendants have received notice of the same.

In reviewing motions for default judgment, courts have referred to the following factors: (1) the amount of money involved in the litigation; (2) whether there are material issues of fact in the case needing resolution; (3) whether the case involves issues of great public importance; (4) whether the grounds for the motion for a default judgment are highly technical; (5) whether the party asking for a default judgment has been prejudiced by the non-moving party's actions or omissions; (6) whether the actions or omissions giving rise to the motion for a default judgment are the result of a good-faith mistake on the part of the non-moving party; (7) whether the actions or omissions giving rise to the motion for a default judgment are the result of excusable neglect

on the part of the non-moving party; and (8) whether the grounds offered for the entry of a default judgment are clearly established. *Tweedy*, 611 F. Supp. 2d at 605-606 (citing *Faulknier v. Heritage Financial Corp.*, 1991 U.S. Dist. LEXIS 15748 (W.D. Va. May 20, 1991) and 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure §§ 2684-85 (1990)).

Courts may order permanent injunctive relief in conjunction with default judgments. *E.g.*, *Trs. of the Nat'l Asbestos Workers Pension Fund v. Ideal Insulation, Inc.*, 2011 U.S. Dist. LEXIS 124337, at *12 (D. Md. Oct. 27, 2011) (collecting cases). Permanent injunctions depriving defendants of their fraudulent, unauthorized infrastructure, on an ongoing basis in the future, have been entered by this Court in connection with entry of default judgments. *See America Online v. IMS*, 1998 U.S. Dist. LEXIS 20645 (E.D. Va. Dec. 30, 1998) (Brinkema, J.); *Microsoft Corp. v. Doe*, 2015 U.S. Dist. LEXIS 109729 (E.D. Va. Aug. 17, 2015) (O'Grady, J.); *Microsoft Corp. v. Doe*, 2015 U.S. Dist. LEXIS 110145 (E.D. Va. July 20, 2015) (Report and Recommendation); *Microsoft Corp. v. Doe*, 2014 U.S. Dist. LEXIS 46951 (E.D. Va. Apr. 2, 2014) (Brinkema, J.); *Microsoft Corp. v. Doe*, 2014 U.S. Dist. LEXIS 48398 (E.D. Va. Jan. 6, 2014) (Report and Recommendation); *see also Microsoft Corp. v. Does*, 2013 U.S. Dist. LEXIS 168237 (W.D.N.C. Nov. 21, 2013)

## IV.    DISCUSSION

### A.    This Court Has Personal Jurisdiction Over Defendants

Based on the uncontroverted facts, Plaintiff has established a prima facie case for personal jurisdiction over Defendants under Rules 4(k)(1) and 4(k)(2) of the Federal Rules of Civil Procedure. Defendants have purposefully availed themselves of the privilege of carrying out their activities in the United States in general, and in Virginia in particular. Because Plaintiff's claims arise directly out of Defendants' contacts with the United States and Virginia,

8

and because exercising jurisdiction would be constitutionally reasonable, a *prima facie* case for personal jurisdiction is easily made here.

A defendant purposefully avails himself of the privilege of conducting business in a forum when he deliberately engages in significant activities within the forum or "has created continuing obligations between himself and residents of the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985) (internal quotation marks omitted). The touchstone of the purposeful availment inquiry is whether a defendant has "fair warning that a particular activity may subject [him] to the jurisdiction of a foreign sovereign," *CFA Institute v. Institute of Chartered Financial Analysts of India*, 551 F.3d 285, 293 (4th Cir. 2009) (quoting *Burger King*, 471 U.S. at 472), or whether his conduct is such that "he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). In the online context, a state may exercise jurisdiction over a defendant when the defendant (1) directs electronic activity into the State, (2) with the manifest intent of engaging in business or other activities within the State, and (3) that activity gives rise to the plaintiff's claims. *See ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002). To decide whether a defendant has purposefully directed electronic activity into a state, the Fourth Circuit has adopted the framework set out in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). *See ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 713-14 (4th Cir. 2002). Under the *Zippo* framework, "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Id.* (quoting *Zippo*, 952 F. Supp. at 1124).

Here, Plaintiff has uncovered evidence that Defendants have sufficient minimum contacts

and have purposely availed themselves of the benefit of operating within the United States in general and in Virginia in particular.  Indeed, Defendants have directed their fraudulent conduct to victims in the United States.  For example, Defendants have and continue to utilize U.S.-based infrastructure, including infrastructure located in the Eastern District of Virginia, in order to continue their illegal activities. *See e.g.*, Gayde Decl. Ex. 2; Complaint, Appendix A. Defendants have specifically directed their activities at victims in Virginia and the Eastern District of Virginia, including specifically directing their unauthorized access to batch information s at Plaintiff's servers at AWS located in the Eastern District of Virginia.  Levin Decl. ¶ 17.  Accordingly, Plaintiff's claims arise directly out of those contacts. *See UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344 (4th Cir. 2020) (exercising personal jurisdiction over a foreign website operator who took steps to aim his website at Virginia).

**B.    Due Process Has Been Satisfied**

Plaintiff has served the Complaint, summons, and all orders and pleadings on Defendants using the methods ordered by the Court under Rule 4(f)(3), including service by email and publication.  It is well settled that legal notice and service by email, facsimile, mail and publication satisfies Due Process where these means are reasonably calculated, in light of the circumstances, to put defendants on notice.  *See, e.g., FMAC Loan Receivables v. Dagra,* 228 F.R.D. 531, 534 (E.D. Va. 2005) (acknowledging that courts have readily used Rule 4(f)(3) to authorize international service through non-traditional means, including email); *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950) (discussing Due Process requirements).  Email service and Internet publication are particularly appropriate here given the nature of Defendants' conduct and use of email as the primary means of communication in connection with establishing and managing the IP addresses used to operate the Shopper Helper

infrastructure. *FMAC Loan Receivables,* 228 F.R.D. at 534; *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014-15 (9th Cir. 2002) ("[Defendant] had neither an office nor a door; it had only a computer terminal. If any method of communication is reasonably calculated to provide [Defendant] with notice, surely it is email…"); *BP Prods. N. Am., Inc. v. Dagra*, 236 F.R.D. 270, 271-273 (E.D. Va. 2005) (approving notice by publication in two Pakistani newspapers circulated in the defendant's last-known location); *Microsoft Corp. v. John Does 1-27,* Case No. 1:10-cv-156 (E.D. Va. 2010, Brinkema J.) at Dkt. 38, p. 4 (authorizing service by email and publication in similar action).

In this case, the email addresses provided by Defendants to infrastructure providers in the course of obtaining services that support the Defendants' activities, and email addresses otherwise uncovered in association with Defendants during discovery, are the most accurate and viable contact information and means of notice and service. Indeed, the physical addresses provided by Defendants to infrastructure providers are false and Defendants' whereabouts are not known precisely and are not ascertainable despite the exercise of diligent formal and informal attempts to identify the Defendants, which further supports service by email and publication. *See BP Products North Am., Inc.,* 236 F.R.D. at 271. Moreover, Defendants will expect notice regarding their use of the infrastructure to operate the fraudulent Shopper Helper app by email, as Defendants agreed to such in their agreements with the service providers who provided the infrastructure for Defendants' use. *See Nat'l Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311 (1964) ("And it is settled … that parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether.").

Given the circumstances and Plaintiff's diligent efforts to locate Defendants, Due Process

has been satisfied by Plaintiff's service by publication and multiple email notices.

C. **Default Judgment Is Appropriate**

All of the relevant considerations point towards issuance of a default judgment against Defendants. *Compare Tweedy*, 611 F. Supp. 2d at 605-606 (applying default factors). First, the amount of money at stake weighs in favor of default judgment because Plaintiff is not requesting any monetary relief, and indeed it is not possible for Plaintiff to obtain any meaningful monetary relief under the circumstances. Accordingly, default judgment poses no risk of undue cost, prejudice, or surprise to Defendants.

Second, there are no material facts in dispute. Plaintiff has put forth a strong factual showing supported by testimony, forensic evidence, and documentary evidence from researchers who have studied the Shopper Helper infrastructure and its impact on Plaintiff and its platform ecosystem. The allegations and evidence in the detailed Complaint and otherwise in the record establish that the Defendants' conduct in operating the Shopper Helper infrastructure violated and is likely in the future to violate the Computer Fraud and Abuse Act (18 U.S.C. § 1020), the Lanham Act (15 U.S.C. §§ 1114, 1125), and the common law claims of intentional interference with contract, trespass, conversion, and unjust enrichment.

Third, this case involves a matter of substantial public importance. Defendants are perpetrating serious offenses and civil torts that cause substantial harm to not only Plaintiff, but to other individual participants in Plaintiff's platform, including Instacart Shoppers, by putting them at a disadvantage. In addition to the general public interest in abating such harm, the public also has a strong interest in the integrity and enforcement of federal laws designed to deter fraudulent conduct.

Fourth, default here is not merely technical. This is not a situation where Defendants

have accidentally missed a deadline by a few days.  Nor is default the result of a good faith mistake or excusable neglect.  Rather, Defendants have affirmatively chosen not to appear and defend this action, despite ample notice and opportunity to do so.  Plaintiff has made extraordinary efforts over the course of many months to ensure that Defendants were provided notice, and the evidence indicates that Defendants are actually aware of this action, but affirmatively choosing not to appear.

Fifth, Plaintiff and other victims of the Shopper Helper infrastructure have been prejudiced by the Defendants' actions and omissions.  Defendants have refused to make their identities known and have refused to participate in this lawsuit.  Defendants' disregard for this Court's process and refusal to communicate have caused Plaintiff to incur significant expense. Finally, the grounds offered for the entry of a default judgment are clearly established. Plaintiff's application for default and supporting declaration establish that Defendants have been served.  Moreover, the detailed Complaint and the record as a whole establishes Defendants' unlawful conduct and the harm it has caused.

### D.   **Plaintiff Has Adequately Pled Each Of Its Claims**

The Complaint alleges that Defendants have violated the Computer Fraud and Abuse Act ("CFAA") (18 U.S.C. § 1020), the Lanham Act (15 U.S.C. §§ 1114, 1125), and the common law doctrines of intentional interference with contract, trespass, conversion, and unjust enrichment. Each of these claims is adequately pled.

**CFAA Claim.**  Congress enacted the Computer Fraud and Abuse Act (the "CFAA") specifically to address computer crime.  *See, e.g., Big Rock Sports, LLC v. AcuSport Corp.*, No. 4:08-CV-159-F, 2011 WL 4459189, at *1 (E.D.N.C. Sept. 26, 2011).  "Any computer with Internet access [is] subject [to] the statute's protection."  *Id.  Inter alia*, the CFAA penalizes a

party that: (1) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage, 18 U.S.C. § 1030(a)(5)(C); or (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer, 18 U.S.C. § 1030(a)(2)(C); or (3) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage to a protected computer, 18 U.S.C. § 1030(a)(5)(A).

A "protected computer" is a computer "used in interstate or foreign commerce or communication." *See Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 926 (E.D. Va. 2017). "The phrase 'exceeds authorized access' means 'to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled to obtain or alter.'" *Id.* at 923 (citing 18 U.S.C. § 1030(e)(6)). In order to prosecute a civil claim under the CFAA, a plaintiff must demonstrate loss or damage in excess of $5,000. The CFAA defines loss as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Sprint Nextel Corp. v. Simple Cell, Inc.*, No. CIV. CCB-13-617, 2013 WL 3776933, at *6 (D. Md. July 17, 2013) (citing 18 U.S.C. § 1030(e)(8)). "'[D]amage . . . means any impairment to the integrity or availability of data, a program, a system, or information.'" *Id.* (citing 18 U.S.C. § 1030(e)(11)). The Fourth Circuit has recognized that this "broadly worded provision plainly contemplates consequential damages" such as "costs incurred as part of the response to a CFAA violation, including the investigation of an offense." *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009). The CFAA permits plaintiffs to aggregate multiple intrusions or

violations for the purposes of meeting the $5,000 statutory threshold. *See Sprint Nextel Corp.*, 2013 WL 3776933, at *7 (citations omitted).

In sum, in order to prevail on their CFAA claim, Plaintiff must establish that Defendants (1) accessed a protected computer; (2) without authorization; (3) for the purpose of obtaining information or defrauding others; (4) resulting in loss or damage in excess of $5,000. The Complaint and the Declarations of Henry S. Levin and Adam Gayde establish that Defendants' conduct satisfies each of these elements. First, Shopper Helper has accessed a protected computer by accessing Plaintiff's servers to obtain batch information. *See supra*; 18 U.S.C. § 1030(e)(2)(B) (defining "protected computer" as a computer "used in interstate or foreign commerce or communication"). Second, Shopper Helper has accessed Plaintiff's servers without authorization. Shopper Helper intercepts authentication tokens created by Plaintiff and uses those tokens without Plaintiff's permission to send queries to Plaintiff's servers and to facilitate unauthorized access to those servers to obtain batch information. Third, Defendants have accessed Plaintiff's servers in order to obtain Plaintiff's order batch data to be misused by Shopper Helper. Finally, the amount of harm caused by Defendants exceeds $5,000. Defendants' conduct is precisely the type of activity that the Computer Fraud and Abuse Act is designed to prevent.

Courts in the Eastern District of Virginia have held that using authentication credentials that do not belong to the individual accessing a computing facility constitutes unauthorized access. *Glob. Pol'y Partners, LLC v. Yessin*, 686 F. Supp. 2d 631 (E.D. Va. 2009) (holding that using a password to access and email account that did not belong to him and lacking a legitimate business reason to do so meant defendant acted without authorization within the meaning of the CFAA); *Hains v. Adams*, No. 3:19-CV-504 (DJN), 2019 WL 5929259 (E.D. Va. Nov. 12, 2019)

(holding that plaintiff pled sufficient facts to allege a CFAA violation when defendant obtained her social media password without permission and used that information to access her social media, email, and online banking). In this case, authentication tokens generated by Plaintiff and presented as credentials for authorized access are analogous to unauthorized presentation of passwords and similar authentication mechanisms. These authentication credentials are assigned to Shoppers by Plaintiff through the Shopper App. In short, defendants, through Shopper Helper, are intercepting and using Instacart-generated credentials that are meant to be used only by the legitimate Shopper App to query Plaintiff's servers.

Thus, Plaintiff properly alleged a CFAA claim and default judgment on this claim is warranted.

**Lanham Act Claims.** Shopper Helper is a mobile application through which Defendants use counterfeit Instacart trademarks, including but not limited to those attached as Appendix B to the Complaint. Defendants developed Shopper Helper to manipulate the underlying code of Plaintiff's Shopper App through the creation and operation of a counterfeit, adulterated version of the Shopper App. However, the compromised Shopper App does not appear any different to a party viewing that app on the mobile device. Anyone viewing the Shopper Helper app, thus, would think that the compromised Shopper App, in the form of Shopper Helper, is developed and distributed by Plaintiff, despite the fact that it is the operators of Shopper Helper that are compromising the Shopper App. This constitutes trademark infringement, trademark counterfeiting, false designation of origin, and dilution under Sections 1114, 1125(a), and 1125(c) of the Lanham Act. *See Microsoft Corp. v. John Does 1-2*, Case No. 1:20-cv-01217-LDH-RER (E.D.V.A 2019), Dkt. 11 (granting temporary restraining order and holding that Defendants' use of Microsoft's trademarks to infiltrate and make changes to the Windows

operating system is designed to cause confusion); *see also JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 340 (D. Md. 2017) (citing 15 U.S.C. § 1114(1)(a)). Defendants reproduce and display copies of Plaintiff's registered, famous and distinctive trademarks in the Shopper Helper app, causing confusion among Shoppers and the public.

A party is liable for trademark counterfeiting where: (1) the defendant intentionally used a counterfeit mark in commerce; (2) the defendant knew that the mark was counterfeit; (3) the use occurred in connection with the sale, offer for sale, or distribution of goods; and (4) the use of the counterfeit mark was likely to confuse consumers. 15 U.S.C. § 1114(1); *Match.Com, LLC v. Fiesta Catering Int'l, Inc.*, No. 1:12-cv-363, 2013 WL 428056, at *6 (E.D. Va. Jan. 31, 2013). The Lanham Act defines a counterfeit mark as "a spurious mark which is identical with, or substantially indistinguishable from, [the plaintiff's] mark." 15 U.S.C. § 1127 (2012); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 269 (4th Cir. 2007). A counterfeit mark does not have to be an exact replica, for that "would allow counterfeiters to escape liability by modifying the registered trademarks of their honest competitors in trivial ways." *United States v. Chong Lam*, 677 F.3d 190, 199 (4th Cir. 2012) (internal quotations and citation omitted).

Defendants have intentionally used Plaintiff's trademarks in commerce without authorization or license. Defendants have created a mobile application that once installed on a Shopper's mobile device, compromises the underlying code of Plaintiff's Shopper App through the creation and operation of a counterfeit, adulterated version of the Shopper App. *Id*. The foregoing acts establish Defendants' unauthorized use of Plaintiff's trademarks in commerce. And where a party produces counterfeit goods, there is a presumption of likelihood of confusion. *See* 15 U.S.C. § 1117(b)-(c) (2012); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th

Cir. 1987).

In addition to constituting infringement and counterfeiting good under section 1114 of the Lanham Act, Defendants' conduct also constitutes false designation of origin under section 1125(a), which prohibits use of a registered mark that: is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.  15 U.S.C. § 1125(a)(1)(A); *see also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995) ("In order to prevail under §§ 32(1) and 43(a) of the Lanham Act for trademark infringement and unfair competition, respectively, a complainant must demonstrate that it has a valid, protectable trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers."). Shopper Helper's use of Plaintiff's trademarks causes confusion and mistakes as to Plaintiff's affiliation with Shopper Helper. This activity is a clear violation of Lanham Act § 1125(a).  *See Automobili Lamborghini S.P.A. v. Garcia*, 467 F. Supp. 3d 385, 404 (E.D. Va. 2020) (finding trademark infringement because similarity between counterfeit marks and Lamborghini's trademarks give rise to an undesired association between the marks);  *Otels, Inc. v. Altun,* No. 1:11-cv-604, 2012 U.S. Dist. LEXIS 114584 (E.D.Va. August 14, 2012) (unauthorized online use of registered mark deemed likely to cause confusion among consumers, constituting trademark infringement)*; Garden & Gun, LLC v. TwoDalGals, LLC*, No. CIV 3:08CV349, 2008 WL 3925276, at *1 (W.D.N.C. Aug. 21, 2008) (granting preliminary injunction against misleading use of trademarks under Section 1125(a)); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1065 (9th Cir. 1999) (entering preliminary injunction under Lanham Act §1125(a) for infringement of trademark in software and website

code); *Hotmail Corp. v. Van$ Money Pie Inc.*, No. C 98-20064 JW, 1998 WL 388389, at *5 (N.D. Cal. Apr. 16, 1998) (granting preliminary injunction; copying the Hotmail trademarks in "e-mail return addresses" constituted false designation of origin; also constituted trademark "dilution" under §1125(c)).

Thus, Plaintiff has properly alleged these Lanham Act claims and default judgment is warranted.

**Tort Claims.**  Defendants' conduct is tortious under the common law doctrines of trespass to chattels, conversion, unjust enrichment, and intentional interference with contractual relationships. Under Virginia law, the tort of conversion "encompasses any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession; and any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *Microsoft Corp. v. Does* 1-2, No. 1:16CV993, 2017 WL 5163363, at *5 (E.D. Va. Aug. 1, 2017), report and recommendation adopted, No. 1:16-CV-00993 (GBL/TCB), 2017 WL 3605317 (E.D. Va. Aug. 22, 2017); *see also Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 697 (D. Md. 2011) (holding defendant liable for conversion where defendant replaced current version of plaintiffs' website with former version, because such action effectively "dispossessed [plaintiff] of the chattel;" i.e., its website).  The related tort of trespass to chattels—sometimes referred to as "the little brother of conversion"—applies where personal property of another is used without authorization, but the conversion is not complete. *Id.*; *see also Vines v. Branch*, 418 S.E.2d 890, 894 (1992).

Here, Defendants have exercised dominion and authority of Plaintiff's platform by intruding into its servers to obtain batch information. Defendants carried out this tortious conduct by fundamentally changing important functions on Plaintiff's Shopper App, thus depriving

Plaintiff of its right to control the content, functionality, and nature of its platform and services. District courts in the Fourth Circuit have recognized that this type of unauthorized intrusion can amount to tortious conduct under the doctrines of conversion and trespass to chattels.  *See supra*; *see also Microsoft Corp. v. Does 1-18*, No. 1:13CV139 LMB/TCB, 2014 WL 1338677, at *9 (E.D. Va. Apr. 2, 2014) ("The unauthorized intrusion into an individual's computer system through hacking, malware, or even unwanted communications supports actions under these claims"); *Microsoft Corp. v. John Does 1-8*, No. 1:14-CV-811, 2015 WL 4937441, at *12 (E.D. Va. Aug. 17, 2015).

Further, Defendants' conduct amounts to unjust enrichment because Plaintiff has demonstrated (1) Plaintiff conferred a benefit on the Defendants; (2) Defendants' knowledge of the conferring of the benefit; and, (3) Defendants' acceptance or retention of the benefit under circumstances that "render it inequitable for the defendant to retain the benefit without paying for its value." *Microsoft Corp. v. John Does 1-8*, 2015 WL 4937441, at *12.

Additionally, Defendants' conduct amounts to tortious interference with a contractual relationship. Tortious interference with a contract under Virginia law requires "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves v. Johnson*, 230 Va. 112 (1985). Plaintiff's Shopper Application Terms of Service (the "Shopper App Terms") prevent Shoppers from automating the functions of the Shopper App or Instacart platform. *See* Tonti Decl. ¶ 6. Any user of the Shopper App must agree to the Shopper App Terms and in using the Shopper App, shoppers who later downloaded Shopper Helper must have agreed to these terms, including

terms prohibiting them from using any form of modifications, exploits, or other unauthorized means to interfere with, or gain undue advantage in the use of the Instacart platform. In creating Shopper Helper, which reproduces the look and functionalities of the Shopper App, Defendants necessarily accessed the Shopper App and therefore knew the Shopper App is restricted by Plaintiff's Shopper App Terms. Nevertheless, Shopper Helper induces users to modify the legitimate Instacart Shopper App by introducing the added functionality of automatically searching for and accepting batches. In addition, Shopper Helper disrupts the normal operation of Plaintiff's platform – i.e., Instacart's complex algorithm to offer batches to available Shoppers – through its automated feature. The Shopper Helper app can cause Shoppers using the legitimate Instacart Shopper App to miss out on opportunities for batches that would otherwise be available to them. Thus, Shopper Helper induces Shoppers to disrupt their contractual relationship with Plaintiff.

The well-pled allegations in Plaintiff's Complaint, which set forth the elements of each of Plaintiff's claims, are taken as true given Defendants default.  *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005).  Accordingly, the only question is what remedy to afford Plaintiff.

### E.      A Permanent Injunction Should Issue To Prevent Further Irreparable Harm

A permanent injunction is appropriate where: (1) plaintiff has suffered an irreparable injury; (2) remedies available at law (e.g. monetary damages), are inadequate to compensate for that injury; (3) considering the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  *See EMI April Music, Inc. v. White*, 618 F. Supp. 2d 497, 509 (E.D. Va. 2009) (citing *Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007)).

**1.      Plaintiff Has Suffered And Is Likely To Suffer Irreparable Injury That Cannot Be Compensated Monetarily**

It is well-settled that consumer confusion and injury to business goodwill constitute irreparable harm.  *See MicroAire Surgical Instruments, LLC v. Arthrex, Inc*., 726 F. Supp. 2d 604, 635 (W.D. Va. 2010) ("The loss of goodwill is a well-recognized basis for finding irreparable harm"); *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994)), *abrogated on other grounds*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008).  A finding of irreparable harm usually follows a finding of unlawful use of a trademark and a likelihood of confusion.  *Ledo Pizza Sys., Inc. v. Singh*, No. CIV. WDQ-13-2365, 2013 WL 5604339, at *3 (D. Md. Oct. 10, 2013); *Nabisco Brands, Inc. v. Conusa Corp.*, 722 F. Supp. 1287, 1290 (M.D.N.C. 1989) ("In the context of a trademark infringement dispute, several courts have held that where likelihood of confusion is established likelihood of success on the merits as well as risk of irreparable harm follow.").  The Court previously found that the harm caused to Plaintiff by the Defendants' Shopper Helper operations and activities, including through computer intrusions and the confusing and misleading use of Plaintiff's trademarks and brands, constitutes irreparable harm. Dkt. 29 at ¶¶ 3-12.  To the extent that Defendants are able to continue to use new infrastructure to carry out computer intrusions against Plaintiff and its Shoppers, or disseminate counterfeit products bearing Plaintiff's trademarks and brands in furtherance of their activities, such irreparable harm would certainly continue in the future.

This finding is consistent with several cases that have concluded that fraudulent computer operations and associated use of trademarks cause irreparable harm.  *See, e.g., Microsoft Corp. v. Peng Yong et al.*, Case No. 1:12-cv-1004-GBL (E.D. Va. 2012) (Lee, J.) (injunction to dismantle botnet command and control servers); *Microsoft v. Piatti, et al.*, Case No. 1:11-cv-1017 (E.D.

Va. 2011) (Cacheris, J.) (injunction to dismantle botnet command and control servers); *Microsoft Corporation v. John Does 1-27*, Case No. 1:10-cv-156 (E.D. Va., Brinkema J.) (same); *Microsoft v. John Does 1-11*, Case No. 2:11-cv-00222 (W.D. Wa. 2011) (Robart, J.) (same); *Microsoft Corp. et al. v. John Does 1-39 et al.*, Case No. 12-cv-1335 (E.D.N.Y. 2012) (Johnson, J.) (same); *FTC v. Pricewert LLC et al.*, Case No. 09-2407 (N.D. Cal. 2009) (Whyte J.) (injunction disconnecting service to botnet hosting company).

In addition to the irreparable harm caused to Plaintiff's goodwill, even the monetary harm caused by Defendants is and will be irremediable absent an injunction because Defendants are elusive parties engaged in fraud, and whom Plaintiff is unlikely to be able to enforce a judgment against. *See, e.g., Khepera-Bey v. Santander Consum. USA, Inc*., 2013 U.S. Dist. LEXIS 87641, 13-14 (D. Md. June 21, 2013) ("circumstances[] such as insolvency or unsatisfiability of a money judgment, can show irreparable harm."); *accord Burns v. Dennis-Lambert Invs., Ltd. P'ship*, 2012 Bankr. LEXIS 1107, 9 (Bankr. M.D.N.C. Mar. 15, 2012) ("a preliminary injunction may be appropriate where 'damages may be unobtainable from the defendant because he may become insolvent before final judgment can be entered.'"); *Rudolph v. Beacon Indep. Living LLC*, 2012 U.S. Dist. LEXIS 7075, 5 (W.D.N.C. Jan. 23, 2012) ("Irreparable harm exists here because of Defendant Beacon's continued occupancy of the Facility without paying any rents, particularly in light of the threat of insolvency by one or more Defendants.").

## 2.     The Balance Of Hardships Overwhelmingly Favors An Injunction

Because Defendants are engaged in an illegal scheme to defraud computer users and injure Plaintiff, the balance of equities clearly tips in favor granting an injunction. *See, e.g., PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 127 (4th Cir. 2011) (where defendant had no legitimate interest in "perpetuating the false and misleading" representations, balance of

23

equities warranted injunction); *US Airways, Inc. v. US Airline Pilots Ass'n,* 813 F. Supp. 2d 710, 736 (W.D.N.C. 2011) (injunction appropriate where, in balance of the equities, denying injunction would result in "enormous disruption and harm" to plaintiff and the public, granting injunction would only require defendant to comply with existing legal duties); *Pesch v. First City Bank of Dallas,* 637 F. Supp. 1539, 1543 (N.D. Tex. 1986) (balance of hardships clearly favors injunction where enjoined activity is illegal).  On one side of the scales of equity rests the harm to Plaintiff and its Shoppers caused by the Defendants' ongoing operation, including ongoing deceptive use of Plaintiff's trademarks and brands.  By contrast, on the other side rests no legally cognizable harm to Defendants because an injunction would only require them to cease illegal activities and not to engage in such conduct in the future.  For this reason, an ongoing permanent injunction is appropriate.  *See US Airways,* 13 F. Supp. 2d at 736.

### 3.     An Injunction is in the Public Interest

The public interest is clearly served by enforcing statutes designed to protect the public, such as the Lanham Act and CFAA.  *See, e.g.*, *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 127 (4th Cir. 2011) (preventing false or misleading representations constitutes a "strong public interest" supporting permanent injunction); *Microsoft Corp. v. Doe*, 2014 U.S. Dist. LEXIS 48398, 32 (E.D. Va. Jan. 6, 2014) (public interest weighed in favor of injunction to enforce CFAA); *BSN Med., Inc. v. Art Witkowski*, 2008 U.S. Dist. LEXIS 95338, 10 (W.D.N.C. Nov. 21, 2008) ("In a trademark case, the public interest is 'most often a synonym for the right of the public not to be deceived or confused.' . . .the infringer's use damages the public interest.") (citation omitted); *Dish Network LLC v. Parsons,* 2012 U.S. Dist. LEXIS 75386, 8-9 (W.D.N.C. May 30, 2012) (public interest weighed in favor of injunction to enforce ECPA). Here, Plaintiff requests an injunction that will continue to ensure that the Defendants'

infrastructure remains disabled, that Defendants are enjoined from engaging in future similar conduct, and retaining jurisdiction to enforce the injunction through motion practice, should Defendants put in place new Shopper Helper infrastructure in the future and should they engage in similar, related activities.  As a result of such injunction, Plaintiff will be able to protect itself and its Shoppers from the harmful effects of Defendants operations and can thereby facilitate a platform and environment for Shoppers that is both secure and equitable. Absent the requested injunction, the Defendants' existing infrastructure would be released back into Defendants' control, Defendants would be able to establish new fraudulent infrastructure with impunity, and Defendants would be able to use that infrastructure to interrupt Plaintiff's ecosystem and relationships, to intrude into Shopper devices and servers, and to deceive Shoppers and other users.

Given the risks the public will face absent an injunction, the calculus is clear.  There is no risk that the injunction will impact any legitimate interest of any party.  Neither Defendants nor any other party has come forward to assert any undue impact by disrupting the service to the infrastructure addressed to date in this action.

## V.    **CONCLUSION**

For the reasons set forth in this brief, and based on the Complaint, the evidence submitted in this case and the Court's prior orders, Plaintiff respectfully requests that the Court grant Plaintiff's Motion for Default Judgment and Permanent Injunction.

Dated: November 3, 2021                                  Respectfully submitted,

/s/ *David J. Ervin*
David J. Ervin (VA Bar No. 34719)
Julia Rebecca Milewski (VA Bar No. 82426)
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW

Washington DC 20004-2595
Telephone:  (202) 624-2500
Fax:         (202) 628-5116
dervin@crowell.com
jmilewski@crowell.com

Gabriel M. Ramsey (*pro hac vice*)
Warrington S. Parker III (*pro hac vice*)
Kayvan M. Ghaffari (*pro hac vice*)
Diane Aguirre-Dominguez (*pro hac vice*)
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Telephone:  (415) 986-2800
Fax:         (415) 986-2827
gramsey@crowell.com
wparker@crowell.com
kghaffari@crowell.com
daguirre-dominguez@crowell.com

*Attorneys for Plaintiff Maplebear Inc. dba
Instacart*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 3, 2021, I will electronically file the foregoing with

the Clerk of Court using the CM/ECF system.  Copies will also be served on the defendants

listed below by electronic mail:

**John Does 1-2**

| | |
|---|---|
| shopperhelper.vip@domainsbyproxy.com | vmsju239920@sina.cn |
| shopper-helper.com@domainsbyproxy.com | wly0914@163.com |
| shopperhelper@shopper-helper.com | ArnoldJuliancZhDx@yahoo.com |
| luckyme77@sina.com | ayg1kq3@21cn.com |
| luckyme77@live.com | backsgarth@gmail.com |
| luckyme77@163.com | bocanzxc@icloud.com |
| luckyme77@hotmail.com | bopenzxc@icloud.com |
| wtf001928346@protonmail.com | bvyc5d@163.com |
| 18680332357@163.com | byrwl041899@sina.cn |
| 247152181@qq.com | cb058khco@sina.cn |
| 280290149@qq.com | cbjjd234@icloud.com |
| 303567924@qq.com | chenwenlong80923@icloud.com |
| 326385959@qq.com | cjh22441@21cn.com |
| 361532917@qq.com | coc63cu99@21cn.com |
| 374168250@qq.com | cs8520420@21cn.com |
| 423315288@qq.com | csouy8@163.com |
| 448149233@qq.com | cssr71@163.com |
| 466170602@qq.com | csycq4@163.com |
| 624206720@qq.com | ctjo08233@sina.cn |
| 742842909@qq.com | ctytv4@163.com |
| 782708691@qq.com | cuqwe8@163.com |
| chenbq48@126.com | cuwis9@163.com |
| chunling88@163.com | dingyulin1997@icloud.com |
| danyutiankong@163.com | dongrongqun188@icloud.com |
| dimg_ren@hotmail.com | doubi930213@icloud.com |
| frankyafeng@vip.sina.com | drjclyu7752@sina.cn |
| guoziye1117@163.com | dsf54m@163.com |
| icy.0135.com@163.com | dsfs6d@163.com |
| jingzhouliuwei@126.com | duajxng0128@sina.cn |
| kuboysocool@163.com | dyk0125@21cn.com |
| liutao5452@gmail.com | ebsr92417@sina.cn |
| liuzhen168@163.com | ejiuyrk3469@sina.cn |
| melthaw@gmail.com | ejxjs6@163.com |
| shoopman@qq.com | eq624mwot@sina.cn |
| shoopmao@qq.com | etdr66@163.com |
| tigergugu@qq.com | faxzdhftw@sina.com |
| vanish1984@gmail.com | fenghaoyang1109@icloid.com |

fenghaoyang1109@icloud.com
filaknvyetyy@hotmail.com
gho9fi@163.com
gongyou5214@163.com
guo49912@163.com
guqsrcv2858@sina.cn
gwsnc402748@sina.cn
heyi19751112@sina.com
hezhc611197@sina.cn
hhewp5@163.com
houmo85416@163.com
hyay57@163.com
i.t5ouzk94r@hotmail.com
isfi44960@sina.cn
itdnnp49qzba@sina.cn
jmi06725@21cn.com
jqkn22@163.com
jvcx8k@163.com
kag51go0@21cn.com
keeteautsup@hotmail.com
kmzu2s@163.com
kqcyfnw4350@sina.cn
lanyulin8988@sina.cn
liuming980921@icloud.com
luckyme77@sina.com
Miaojiaomengjiuliang504324@hotmail.com
mndmp5@163.com
mojunzxc@icloud.com
mubzwv84uazl@sina.cn
nasemf78vgqr@sina.cn
oilo07752@sina.cn
ookoz2@163.com
oomum4@163.com
oooai4@163.com
ouk3699@21cn.com
oxzj09238@sina.cn
oztzkoo3945@sina.cn
patrickjobutler@protonmail.com
pgo8u8@163.com
pi51402@163.com
pi91724@163.com
pkc73196@21cn.com
pnzjv9@163.com
pttbvth9xzro@sina.cn
pzssjpp3371@sina.cn
qab3665@21cn.com

qkn22@163.com
qqtwacel@163.com
qqz0zl31@21cn.com
quzxdn00yaxj@sina.cn
rgi603@163.com
ricid916w@sina.cn
rtuiu5@163.com
rutiy67@163.com
rvcz33455@sina.com
rwf6gk44@21cn.com
rxzuarz5zlxg@sina.cn
salvh2@163.com
scmkc0@163.com
shutuyou777@163.com
slopj301775@sina.cn
synwq277t@sina.cn
tisg86@163.com
tiuc58@163.com
tiumc3@163.com
tiumh3@163.com
tjvtjdtk@sina.com
tyg67xd@163.com
u9xn75@163.com
ubdy4g@icloud.com
udbdu34@icloud.com
uoqe01@163.com
usba5a@163.com
vlbjqwb5201@sina.cn
vmsju239920@sina.cn
vytj3c@icloud.com
wanglijian1214@gmail.com
wbzja3@163.com
wif59310@21cn.com
wuhuiapple39@163.com
xfpgn529623@sina.cn
xh68gt@163.com
xia68hh8@21cn.com
xjvuw3@163.com
xkjmn0@163.com
xkrmj9@163.com
xkyft6@163.com
xlbwp7@163.com
xlonk6@163.com
xlxbx9@163.com
xnnl08776@sina.cn
xtjro0@163.com

xu@xhmzd.com
xyeyfpq0255@sina.cn
ybsckme3083@sina.cn
ypm0oi67@21cn.com
yu2296416@163.com

zazr@sina.com
zhaiqiangkang25893@21cn.com
zojcx8@163.com
zvj64dfv@icloud.com

*/s/ David J. Ervin*
David J. Ervin (VA Bar No. 34719)
Julia Milewski (VA Bar No. 82426)
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington DC 20004-2595
Telephone:  (202) 624-2500
Fax:        (202) 628-5116
dervin@crowell.com
jmilewski@crowell.com

*Attorneys for Plaintiff Maplebear Inc. dba*
*Instacart*